

AO 91 (Rev. 11/11) Criminal Complaint      AUSA Prashant Kolluri (312) 886-9085

**FILED**
10/01/2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CASE NUMBER: **20 CR 700** |
| SANTOS TEODORO AC-SALAZAR and OLGA CHOC LAJ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From in or around February 2019 to on or about February 4, 2020, at Aurora, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1589(a)(1) and (a)(3) | knowingly provided and obtained the labor and services of a person, namely Victim A, by means of force, threats of force, physical restraint, and threats of physical restraint and by means of the abuse and threatened abuse of law and legal process. |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

**TRISTAN R STANGER**
Digitally signed by TRISTAN R STANGER
Date: 2020.09.30 16:27:11 -05'00'

TRISTAN STANGER
Special Agent, Homeland Security Investigations

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the complaint and affidavit by telephone.

Date: October 1, 2020

*Judge's signature*

City and state: Chicago, Illinois

JEFFREY COLE, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, TRISTAN STANGER, being duly sworn, state as follows:

1.     I am a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations (HSI), and have been so employed since approximately 2009.  As part of my duties as an HSI Special Agent, I investigate criminal violations relating to alien harboring, alien smuggling, human trafficking, forced labor, the importation of aliens for immoral purposes, and visa fraud, including offenses defined by 18 U.S.C. § 1589.

2.     This affidavit is submitted in support of a criminal complaint alleging that SANTOS TEODORO AC-SALAZAR and OLGA CHOC LAJ have violated Title 18, United States Code, Section 1589(a)(1) and (a)(3).  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging AC-SALAZAR and CHOC LAJ with forced labor, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, information provided to me by persons with knowledge regarding relevant facts, and my review of documents and reports related to this investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

4.     In approximately February 2020, HSI and the U.S. Department of Labor, Office of Inspector General, received information from the Illinois Department of Children & Family Services ("DCFS") and Aurora Police Department ("APD") that AC-SALAZAR and CHOC LAJ were housing two potential victims of human trafficking.  Upon further investigation, and as set forth below, federal agents determined that AC-SALAZAR and CHOC LAJ were living with two female juvenile aliens ("Victim A" and "Victim B") in Aurora, Illinois, and forcing Victim A to work.

5.     Federal agents interviewed Victim A, AC-SALAZAR, CHOC LAJ, and an individual ("Individual A") who explained that she babysat Victim B; observed forensic interviews of Victims A and B; and obtained and reviewed immigration and other documents relevant to this investigation.  Details of the interviews and obtained documents are set forth below.

## I.     The APD Responds to a Report of Child Abuse.

6.     According to APD reports, on or about February 4, 2020, Individual A contacted the APD to report suspected child abuse.  APD officers responded to Individual A's residence, and Individual A informed the APD officers, in summary, that Victim B, who was inside Individual A's residence, told Individual A that she was physically abused by AC-SALAZAR and CHOC LAJ.[1] Individual A also told the officers that Individual A knew AC-SALAZAR and CHOC LAJ; Individual A

---

[1] According to APD reports, the conversation between the officers and Individual A was in Spanish, which one of the officers spoke and understood.

previously babysat Victim B for AC-SALAZAR and CHOC LAJ; and in or around December 2019, Victim B told Individual A that AC-SALAZAR and CHOC LAJ were physically abusing her. According to APD reports, Individual A also told the officers that Individual A talked with Victim B earlier in the day (on or about February 4, 2020), and Victim B stated that she did not want to go home because AC-SALAZAR and CHOC LAJ recently hit Victim B with a belt and a cell phone charging cord.

7.      According to APD reports, on or about February 4, 2020, one of the officers talked with Victim B, who previously told Individual A and Victim A that she was approximately 11 years old.[2]  Victim B told the officer that AC-SALAZAR and CHOC LAJ recently hit her with a belt and a cell phone charging cord. According to APD reports, the officers observed visible injuries on Victim B's arm and leg, and one of the officers took photographs of the injuries.

8.      According to APD reports, on or about February 4, 2020, officers took protective custody of Victim B, and DCFS was notified of the suspected physical abuse. According to APD reports, there were two other minors at the residence where AC-SALAZAR and CHOC LAJ lived, which was located in Aurora, Illinois (the "Residence").

**II.     APD Officers Arrest AC-SALAZAR and CHOC LAJ.**

9.      According to APD reports, officers went to the Residence on or about February 4, 2020, to talk to AC-SALAZAR and CHOC LAJ about Victim B's reported

---

[2] The conversation between the APD officer and Victim B took place in Spanish.

abuse and visible injuries. The conversations between APD officers and AC-SALAZAR and CHOC LAJ were in Spanish.

10.     According to APD reports, AC-SALAZAR told officers, in summary, that he had adopted Victim B in Guatemala and that CHOC LAJ was not Victim B's mother. AC-SALAZAR further stated that he did strike Victim B with a belt. The conversation between APD officers and AC-SALAZAR was not recorded. APD officers arrested AC-SALAZAR on or about February 4, 2020, and advised him of his *Miranda* rights.

11.     According to APD reports, an officer interviewed CHOC LAJ after advising CHOC LAJ of her *Miranda* rights. The interview between the APD officer and CHOC LAJ was recorded. CHOC LAJ told the officer that she did not hit Victim B but that she saw AC-SALAZAR hit Victim B with a belt. APD officers arrested CHOC LAJ on or about February 4, 2020.

12.     According to APD reports, DCFS personnel came to the Residence on or about February 4, 2020, and took protective custody of the two other minor children in the Residence: Juvenile A, who was AC-SALAZAR's and CHOC LAJ's biological infant child, and Victim A.

## III.   Interviews of Victim A, Victim B, Individual A, CHOC LAJ, and AC-SALAZAR.

### A.   Victim A

13.     I and other federal agents interviewed Victim A on or about May 29, 2020, and on or about September 17, 2020. I and another federal agent also observed Victim A be interviewed by a child forensic interview specialist and a victim

4

assistance coordinator on or about February 11, 2020. The three interviews were conducted in Spanish, which Victim A said she spoke and understood.[3]

14.　Victim A is a citizen of Guatemala and is 17 years old. According to Victim A, she decided in or around early 2019 to come to the United States and contacted a smuggler, who put her in touch with CHOC LAJ. Victim A did not know CHOC LAJ prior to the smuggler putting them in contact.

15.　According to Victim A, she and CHOC LAJ traveled together from Guatemala to the United States. Upon entering the United States, Victim A and CHOC LAJ encountered U.S. immigration authorities and were arrested. According to Victim A, CHOC LAJ gave the arresting officers fraudulent identity information about Victim A and CHOC LAJ.[4]

16.　After U.S. immigration authorities released Victim A and CHOC LAJ a few days after their arrest, Victim A said that she and CHOC LAJ initially traveled to Virginia but then moved to Florida shortly thereafter because CHOC LAJ told Victim A that there was no work for them in Virginia.

---

[3] No promises or payments have been made to Victim A regarding this investigation; however, federal agents have submitted documents to allow Victim A to stay in the United States until this case has been resolved.

[4] U.S. Department of Homeland Security ("DHS") records show that CHOC LAJ and Victim A entered the United States on or about February 22, 2019, near El Paso, Texas, and encountered U.S. immigration authorities. According to the records, CHOC LAJ and Victim A provided immigration authorities with different names at the time of entry and were later released from custody pending further removal proceedings.

17. After they arrived in Florida, Victim A said that CHOC LAJ told her that CHOC LAJ was pregnant with Juvenile A and that the father of the child was AC-SALAZAR.

18. According to Victim A, while in Florida, she worked as a roofer and was paid in cash. CHOC LAJ took all of Victim A's earnings. CHOC LAJ told Victim A that she needed the money to pay the smuggler for getting CHOC LAJ and Victim A into the United States and also needed to send money to AC-SALAZAR in Guatemala so that he could come to the United States. When they were in Florida, Victim A told CHOC LAJ that she wanted to go to school, but CHOC LAJ told Victim A that she had to work and give CHOC LAJ the earnings. Victim A stated that she did as CHOC LAJ said because she was "scared" of CHOC LAJ and what CHOC LAJ might do to her.

19. After they were in Florida for a few weeks, an individual at the roofing company told Victim A that she could no longer work there because she was not 18 years old. As a result, Victim A and CHOC LAJ traveled to Aurora, Illinois.

20. According to Victim A, she and CHOC LAJ initially stayed with an individual in Aurora who found them work at a factory. Victim A was paid by check for her work at the factory, and CHOC LAJ took Victim A's earnings. When they were in Aurora, Victim A again told CHOC LAJ that Victim A wanted to go to school, but CHOC LAJ would not let Victim A go to school. When Victim A did not want to go to work on some days, she said that CHOC LAJ would "get mad" at Victim A and

"make [Victim A] go to work." Victim A said that she went to work because she was "scared" of CHOC LAJ and what CHOC LAJ might do to her.

21.     According to Victim A, in approximately May 2019, AC-SALAZAR and Victim B arrived in Aurora. Victim A had never met AC-SALAZAR or Victim B prior to their arrival. Victim B told Victim A that she was about 11 years old. After AC-SALAZAR and Victim B arrived in Aurora, Victim A, Victim B, AC-SALAZAR, and CHOC LAJ moved to the Residence.

22.     According to Victim A, AC-SALAZAR and CHOC LAJ made Victim A and Victim B perform household chores, including cleaning the Residence, washing the clothes, and cooking. If Victim A and Victim B did not do those chores, AC-SALAZAR and CHOC LAJ would "get mad" at them. Victim A said that AC-SALAZAR and CHOC LAJ would also hit Victim B. Victim A saw AC-SALAZAR hit Victim B on one occasion. Victim A also saw bruises on Victim B's body after she had been beaten, and Victim B told Victim A that both AC-SALAZAR and CHOC LAJ hit her.

23.     According to Victim A, following AC-SALAZAR's arrival in Aurora, Victim A found various jobs through a staffing company that required her to be at least 18 years old. According to Victim A, AC-SALAZAR gave her fraudulent documents to use that said she was an adult even though Victim A was a minor. Victim A said that AC-SALAZAR kept those fraudulent documents with him at the

Residence.  Victim A also said that AC-SALAZAR kept her passport and other identification documents and would not let Victim A have them.[5]

24.    According to Victim A, CHOC LAJ gave birth to Juvenile A in approximately October 2019.  CHOC LAJ told Victim A and Victim B that they needed to take care of Juvenile A.  Victim A said that she and Victim B took care of Juvenile A by feeding him, watching him, and changing his diapers, and that CHOC LAJ and AC-SALAZAR did not help.

25.    After Juvenile A was born, Victim A said that CHOC LAJ and AC-SALAZAR stopped working.  As a result, Victim A was the only person at the Residence with a paying job for several months.  Victim A said that CHOC LAJ and AC-SALAZAR took her earnings.  Victim A also said that AC-SALAZAR kept some documents at the Residence that contained financial information about her earnings.

26.    When Victim A told AC-SALAZAR and CHOC LAJ that she no longer wanted to stay with them, they told Victim A that she could not leave until she paid off her debt to the smuggler, as well as AC-SALAZAR's and CHOC LAJ's debts to their smugglers.  Victim A stated that she did as AC-SALAZAR and CHOC LAJ said because she was "scared" of them and what they might do to her.

27.    According to Victim A, while she was living with AC-SALAZAR and CHOC LAJ, she could not leave the Residence without permission except to go to work.  AC-SALAZAR and CHOC LAJ told Victim A that the police would "grab" her

---

[5] Documents from the staffing company that Victim A used show that Victim A received pay stubs from the company between approximately July 2019 and January 2020.

if she left the Residence since Victim A was in the country illegally. Victim A also said that AC-SALAZAR and CHOC LAJ did not give her a cell phone, computer, or internet access, and would not let Victim A communicate with her family in Guatemala.[6]

B.    Victim B

28.    On or about February 11, 2020, I and another federal agent observed Victim B be interviewed by a child forensic interview specialist and a victim assistance coordinator. The interview was recorded and conducted in Spanish, which Victim B had some ability to communicate in. According to Victim B, her primary language is Q'eqchi', a Mayan dialect. Victim B previously told Victim A and Individual A that she is approximately 11 years old.[7]

29.    According to Victim B, she met AC-SALAZAR in Guatemala and came to the United States with him.[8] Victim B said that AC-SALAZAR did not know her family in Guatemala and did not live with Victim B's mother. Victim B also said that she did not know CHOC LAJ or Victim A prior to arriving in Aurora.

---

[6] Victim A stated during the interview that in approximately October 2019 when CHOC LAJ was in labor and went to the hospital, Victim A went into AC-SALAZAR's and CHOC LAJ's bedroom at the Residence, took a debit card, and snuck out of the Residence to purchase a cell phone and call her family.

[7] No promises or payments have been made to Victim B regarding this investigation; however, federal agents have submitted documents to allow Victim B to stay in the United States until this case has been resolved.

[8] According to DHS records, Victim B is a citizen of Guatemala.

30.     According to Victim B, AC-SALAZAR and CHOC LAJ made Victim A and Victim B perform household chores, including cleaning the Residence, washing the clothes, and caring for their infant child, Juvenile A.

31.     According to Victim B, if Victim B did not perform those chores, AC-SALAZAR would hit her. According to Victim B, AC-SALAZAR had hit her with a belt and an antenna. Victim B said that CHOC LAJ also hit her if Victim B did not want to take care of Juvenile A.

32.     According to Victim B, she knew Victim A worked at a paying job and AC-SALAZAR took Victim A's earnings.

**C.      Individual A**

33.     I and other federal agents interviewed Individual A on or about May 29, 2020, and on or about September 17, 2020. The interviews were conducted in Spanish.

34.     Individual A is 38 years old and has lived in Aurora for approximately 20 years.[9] Individual A first met CHOC LAJ in approximately December 2019. CHOC LAJ told Individual A that she was looking for someone to babysit Juvenile A and Victim B, who CHOC LAJ said was AC-SALAZAR's niece. Individual A told CHOC LAJ that she could babysit both kids.

35.     According to Individual A, CHOC LAJ also stated that she and AC-SALAZAR were looking for work. Individual A found CHOC LAJ and AC-SALAZAR

---

[9] Individual A has no criminal history and is receiving no benefits for the information she has provided. Individual A is not a lawful citizen or permanent resident of the United States.

a cleaning job through some people Individual A knows in Aurora. CHOC LAJ told Individual A that she also had an 18-year-old girl who was interested in working. Individual A later learned that CHOC LAJ was referring to Victim A, who CHOC LAJ said was her niece. CHOC LAJ told Individual A that she needed Victim A to work so that Victim A could earn money.

36.    According to Individual A, she babysat Juvenile A and Victim B on approximately four occasions in or around December 2019. Individual A noticed during those instances that Victim B seemed "scared" and had visible bruising on her legs and thighs.

37.    According to Individual A, Victim B told Individual A that AC-SALAZAR and CHOC LAJ hit her. Victim B also told Individual A that AC-SALAZAR and CHOC LAJ would make Victim B watch their baby, Juvenile A, including at night when Victim B was tired and wanted to go to sleep. Victim B told Individual A not to say anything about the physical abuse because Victim B was scared of CHOC LAJ.

38.    Individual A said that she saw Victim B on or about February 4, 2020, and Victim B told Individual A that she did not want to go back to the Residence because AC-SALAZAR and CHOC LAJ had recently hit her with a belt and a cell phone charging cord. Individual A saw visible injuries on Victim B's arm and leg and called the police to report the physical abuse. Individual A also took photographs of Victim B's injuries and gave the photographs to the police.

39.    Individual A provided law enforcement personnel with her text messages with Victim A. In a text message that Victim A sent to Individual A on or about January 23, 2020, Victim A told Individual A that Victim A was worried that CHOC LAJ would "hit" her if Victim A went to Individual A's house for dinner.[10]

## D.    CHOC LAJ

40.    On or about February 6, 2020, I and another law enforcement officer interviewed CHOC LAJ at the APD. Prior to the interview, CHOC LAJ signed a Spanish-language *Miranda* acknowledgment form and agreed to speak with us. The interview was recorded and conducted in Spanish, which CHOC LAJ said she spoke and understood. At no time during the interview did CHOC LAJ request an attorney, and to my knowledge, CHOC LAJ was not represented by an attorney at the time of the interview.[11]

41.    During the interview, CHOC LAJ said that she and Victim A came to the United States from Guatemala. CHOC LAJ said that Victim A was her cousin but that she did not know Victim A's age or the names of Victim A's parents. CHOC LAJ said that she met Victim A for the first time while traveling to the United States

---

[10] The language quoted from the text messages is based on a preliminary review of those messages and not on final transcripts of the messages. The date listed for the text messages is an approximation. The summary of the text messages do not include all statements made or topics covered during the course of the messages. Finally, because the text messages were in Spanish, I have relied on draft, not final, translations of the messages done by other federal law enforcement personnel.

[11] The interview of CHOC LAJ took place approximately two days after APD officers arrested CHOC LAJ and before any charges were brought against CHOC LAJ.

and that CHOC LAJ and Victim A came to the United States about two months before AC-SALAZAR and Victim B.

42.     During the interview, CHOC LAJ initially denied bringing Victim A to the United States so that she could secure immediate release after entering the country but subsequently admitted that was her motive for traveling to the United States with Victim A.

43.     CHOC LAJ also acknowledged that she worked with a smuggler to arrange her travel to the United States with Victim A. CHOC LAJ said that she and AC-SALAZAR owed a lot of money to the smugglers who brought them to the United States and that neither CHOC LAJ nor AC-SALAZAR were currently employed in the United States.

44.     During the interview, CHOC LAJ initially denied that Victim A worked in the United States but later acknowledged that Victim A worked at a cleaning job and also at an Aurora-area staffing company. CHOC LAJ said that Victim A earned approximately $360 per week and that no one else in the Residence, including CHOC LAJ and AC-SALAZAR, was working at the time. CHOC LAJ admitted that she took Victim A's earnings to pay the bills and other household expenses.

45.     CHOC LAJ said that she first met Victim B when Victim B came to Aurora with AC-SALAZAR. CHOC LAJ said that AC-SALAZAR had adopted Victim B in Guatemala. CHOC LAJ said that Victim B did not do any household chores except for helping Victim A on occasion with some chores. CHOC LAJ said that she

13

never hit Victim B but admitted that she yelled at Victim B for missing school. CHOC LAJ also admitted that she saw AC-SALAZAR hit Victim B with a belt.

### E. AC-SALAZAR

46. On or about February 6, 2020, I and another law enforcement officer interviewed AC-SALAZAR at the APD. Prior to the interview, AC-SALAZAR signed a Spanish-language *Miranda* acknowledgment form and agreed to speak with us. The interview was recorded and conducted in Spanish, which AC-SALAZAR said he spoke and understood. At no time during the interview did AC-SALAZAR request an attorney, and to my knowledge, AC-SALAZAR was not represented by an attorney at the time of the interview.[12]

47. During the interview, AC-SALAZAR said that he had been living in Aurora with CHOC LAJ, Victim A, and Victim B since about September 2019.

48. AC-SALAZAR said that he adopted Victim B in Guatemala, their native country, and that the adoption papers were at the Residence. AC-SALAZAR said that Victim B's mother lives in Guatemala and that her father was deceased. AC-SALAZAR said that he brought Victim B with him to the United States but denied using her status as a minor to avoid detention by U.S. immigration authorities.

49. AC-SALAZAR said that he had enrolled Victim B in a school a few weeks prior to his arrest, after child welfare workers informed him that Victim B needed to

---

[12] The interview of AC-SALAZAR took place approximately two days after APD officers arrested AC-SALAZAR and before any charges were brought against AC-SALAZAR.

go to school. AC-SALAZAR admitted that he hit Victim B with a belt because he was angry that she had absences from school.[13]

50.     AC-SALAZAR initially said that he was the only person at the Residence who worked but later acknowledged that he had not been working. AC-SALAZAR admitted that Victim A worked at a factory and that her earnings were used to pay rent and other household expenses. AC-SALAZAR initially said that Victim A did not use fraudulent identity documents to work in the United States, but he later admitted that Victim A used fraudulent identity documents to obtain work in the United States and that he had seen those fraudulent documents at the Residence.

51.     DHS records show that AC-SALAZAR and Victim B entered the United States on or about May 10, 2019, near El Paso, Texas, and encountered U.S. immigration authorities. According to the records, AC-SALAZAR and Victim B were later released from custody pending further removal proceedings.

52.     Individual A provided federal agents with two documents that appear to be a Guatemalan birth certificate and birth registry form for Victim B. Both documents list Victim B's date of birth in February 2011 and list AC-SALAZAR as Victim B's father. Neither document appears to reference AC-SALAZAR's adoption of Victim B. Both documents also include a date of April 30, 2019, which is

---

[13] Documents obtained pursuant to subpoena from an Aurora elementary school show that Victim B was enrolled in the school on or about January 24, 2020. The documents also show that Victim B had an unexcused absence on or about January 28, 2020, and was tardy to school on or about January 27, 2020, and on or about February 3, 2020.

approximately 10 days prior to AC-SALAZAR's and Victim B's entry into the United States.

## IV.    Search Warrant and Relevant Documents

53.    On or about July 2, 2020, a federal search warrant was executed on documents and personal items that APD collected from the Residence when the landlord of the Residence told APD officers that he would throw away the items following AC-SALAZAR's and CHOC LAJ's arrest. 20 M 343 (N.D. Ill.) During the execution of the search warrant, I and another federal agent seized a counterfeit U.S. Permanent Resident card with CHOC LAJ's name on it, as well as handwritten notes that contained comments in Spanish that appear to reference different amounts of money and the states of Virginia and Florida.

54.    Law enforcement also obtained pursuant to subpoena documents from the Aurora-area staffing company that Victim A used ("Company A"). Those documents show that Victim A received pay stubs from Company A between approximately July 2019 and January 2020. Documents from Company A also show that AC-SALAZAR and CHOC LAJ received pay stubs from Company A between approximately July 2019 and October 2019.

55.    The documents from Company A also included images of a U.S. Permanent Resident card for CHOC LAJ that appears to be the same card seized in accordance with the warrant; a Social Security card for CHOC LAJ; images of a U.S. Permanent Resident card and Social Security card for Victim A; and digitally signed

Form I-9s (Employment Eligibility Verification forms) for CHOC LAJ, AC-SALAZAR, and Victim A, attesting that each is a lawful permanent resident of the United States.

56.     According to DHS records, CHOC LAJ, AC-SALAZAR, and Victim A are not lawful permanent residents of the United States. Furthermore, based on a review of law enforcement databases, it does not appear that CHOC LAJ, AC-SALAZAR, and Victim A were issued Social Security cards.

## V.     AC-SALAZAR Pleads Guilty to Aggravated Battery.

57.     According to Circuit Court of Kane County records, on or about September 14, 2020, AC-SALAZAR pled guilty to one count of aggravated battery to a child under 13, in violation of 720 ILCS 5/12-3.05(b)(2). According to the records, the court sentenced AC-SALAZAR to 227 days' imprisonment (time served) and 30 months' probation, which includes the condition that AC-SALAZAR have no contact with Victim B.

58.     Following release from Kane County custody, federal agents arrested AC-SALAZAR on or about September 14, 2020, for unlawfully being present in the United States and turned him over to U.S. Immigration and Customs Enforcement, where he currently remains in custody.

59.     According to Kane County law enforcement personnel, CHOC LAJ has been in custody since her arrest on or about February 4, 2020, and was subsequently charged with aggravated battery, which is still pending before the Circuit Court of Kane County.

## CONCLUSION

60.     Based on the above information, there is probable cause to believe that

SANTOS TEODORO AC-SALAZAR and OLGA CHOC LAJ knowingly provided and

obtained the labor and services of a person, namely Victim A, by means of force,

threats of force, physical restraint, and threats of physical restraint and by means of

the abuse and threatened abuse of law and legal process.

FURTHER AFFIANT SAYETH NOT.

TRISTAN R STANGER
Digitally signed by
TRISTAN R STANGER
Date: 2020.09.30
16:27:46 -05'00'

TRISTAN STANGER
Special Agent, Homeland Security
Investigations


SWORN TO AND AFFIRMED by telephone on October 1, 2020.

Honorable JEFFREY COLE
United States Magistrate Judge

18